IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| CONSUMERS PRODUCE COMPANY, INC. OF PITTSBURGH; PREMIER PRODUCE CO., INC.; J.E. CORCORAN COMPANY, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Civil Action No. 14-314 Chief Magistrate Judge Maureen P. Kelly |
| Fredericktown PRODUCE CO., INC.; DONNA M. GILES *EXECUTRIX OF THE ESTATE OF GENE M. GILES;* and NORTHWEST SAVINGS BANK, | ) ) ) ) | Re: ECF Nos. 39, 40 |
| Defendants. | ) ) | |
| vs. | ) ) | |
| DONNA M. GILES *EXECUTRIX OF THE ESTATE OF GENE M. GILES,* | ) ) | |
| Cross-Defendant. | ) | |


**OPINION**

**KELLY, Chief Magistrate Judge**

Pending before the Court are cross-motions for summary judgment (ECF Nos. 39 and

40), which seek to determine first, whether, as a matter of law, the proceeds of a life insurance

policy purchased and paid for by Fredericktown Produce Co., Inc. ("Fredericktown") are an asset

of a statutory trust created by the Perishable Agricultural Commodities Act ("PACA"), 1930, § 1

*et seq.*, 7 U.S.C. § 499a et seq, and, second, if so, whether Defendant Northwest Savings Bank

("NSB") must disgorge policy proceeds received by it after the death of the named insured.  For

the following reasons, the Court finds that the policy was a PACA asset and that NSB is not

entitled to retain the proceeds.  Accordingly, the Motion for Summary Judgment filed on behalf

of Plaintiffs Consumer Produce Company, Inc. of Pittsburgh, Premier Produce Co., Inc. and Coface North America, Inc. as assignee of J.E. Corcoran Company (collectively, "Plaintiffs" or "CP"), (ECF No. 40), is granted, and the Motion for Summary Judgment filed on behalf of NSB, (ECF No. 39), is denied.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The parties have filed a Stipulation of Undisputed Facts, (ECF No. 38), from which all facts necessary for the disposition of the pending motions can be drawn.

From its inception, Defendant Fredericktown was a business engaged in buying and selling wholesale quantities of produce.  Gene Michael Giles ("Mike Giles") was Fredericktown's sole owner and principal. Fredericktown operated subject to and licensed under PACA, and was a trustee thereunder with an obligation to pay its produce suppliers pursuant to the PACA trust provisions set forth at 7 U.S.C. § 499e(c).  Plaintiffs are licensed produce suppliers under PACA, and acted to preserve their trust rights by including the required statutory language on all invoices.

Between May 31, 2013, and January 24, 2014, Plaintiffs sold to Fredericktown wholesale quantities of produce worth $361,992.57, an amount which remains unpaid.  In attempting to recoup the debt owed, Plaintiffs seek to recover $200,000, paid to NSB through the proceeds of a life insurance policy purchased by Fredericktown from Valley Forge Life Insurance Company,[1] on March 28, 1997.

As initially issued in 1997, Fredericktown was the designated beneficiary of the policy, which insured the life of Mike Giles, with a total death benefit of $250,000.   In 2007, NSB

---

[1] Valley Forge Life Insurance Company later merged with or otherwise changed its name to Jackson National Life Insurance Company ("Jackson National").

received an assignment of the policy in conjunction with a mortgage transaction between NSB, Mike Giles and his wife, Donna Giles.

In the course of the 2007 transaction, NSB provided a mortgage loan to Mike and Donna Giles in the amount of $1,135,000 (the "Giles Mortgage"). The funds were used for the acquisition of property in their names, as tenants in the entirety, and for the construction of a commercial building on the property, also owned by them. Since its construction, the building has housed Fredericktown's business operation as well as those of an affiliated business known as Country Fresh Market. Fredericktown does not own the property or the building, and has paid rent directly to NSB for its use of the building.

In accordance with the terms of the mortgage transaction, Mike Giles signed a guaranty for the mortgage and granted NSB a security interest in Fredericktown's assets as collateral for the loan. As additional collateral, NSB required and received an assignment of the 1997 life insurance policy owned and paid for by Fredericktown, insuring the life of Mike Giles. The assignment was executed by Mike Giles, acting in his capacity as Fredericktown's President, and Donna Giles, as the "Policyowner's Spouse." (ECF No. 38-2). Under the assignment, $200,000 of the policy's total death benefit of $250,000 would be paid to NSB if owed at the time of death, or upon default on the loan. Id. Fredericktown reserved its right to the remaining $50,000, to be paid in accordance with the terms of the policy as issued Id.,

Fredericktown and NSB notified the insurer of the assignment and submitted the appropriate documentation to Jackson National. The documentation does not reflect that NSB's recovery under the policy is limited to $200,000, but this recovery limitation was an acknowledged part of the agreement between NSB and Mike Giles, on behalf of Fredericktown. Pursuant to the agreement, NSB was not required to make premium payments on the policy, and

none were made by it. Rather, all premiums were paid by Fredericktown on a quarterly basis, from an account into which proceeds from the sale of agricultural products were placed. Fredericktown also remitted monthly payments for the Giles' mortgage to NSB, and listed the payments on its books as "rent."

Mike Giles passed away on January 21, 2014. In response to NSB's demand for payment dated February 25, 2014, Jackson National forwarded $200,000 directly to NSB. The remaining $50,000 was sent by Jackson National to Fredericktown, and was ultimately deposited in Fredericktown's bank account. In April 2014, after this lawsuit was filed, NSB received a payment from Fredericktown in the total amount of $55,672.17. As of May 31, 2014, Fredericktown had $52,293 in its NSB accounts.

NSB does not dispute that pursuant to PACA, Plaintiffs have a superior right to the sums received by NSB from Fredericktown in April 2014 and to any sums remaining in Fredericktown's accounts. The parties further agree that the first notice NSB had that Fredericktown failed to pay produce suppliers occurred when NSB was served with this lawsuit on March 15, 2014. There is no evidence that NSB knew or should have known of any breach by Fredericktown of its obligations under PACA prior to that date.

As of the filing of the parties' cross-motions for summary judgment, all substantial assets of Fredericktown have been liquated and it is no longer operating as a wholesale produce business. The property, purchased by Donna Giles and her deceased husband as tenants in the entirety, is presumed to now be the exclusive property of Donna Giles, subject to the NSB mortgage.

## II.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. Id. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 257; Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America, 927 F.2d 1283, 1287–88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consolidated Rail Corporation, 963 F.2d 599, 600 (3d Cir. 1992).  In order to avoid summary judgment, however, parties may not rely on unsubstantiated allegations. Parties seeking to establish that a fact is or is not genuinely disputed must support such an assertion by "citing to particular parts of materials in the record," by showing that an adverse party's factual assertion lacks support from cited materials, or by demonstrating that a factual assertion is unsupportable by admissible evidence. Fed. R. Civ. P. 56(c)(1); see Celotex, 477 U.S. at 324 (requiring evidentiary support for factual assertions made in response to

summary judgment). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio</u>, 475 U.S. 574, 586 (1986). Parties must produce evidence to show the existence of every element essential to its case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex</u>, 477 U.S. at 323; <u>see</u> <u>Harter v. G.A.F. Corp.</u>, 967 F.2d 846, 851 (3d Cir. 1992). Failure to properly support or contest an assertion of fact may result in the fact being considered undisputed for the purpose of the motion, although a court may also give parties an opportunity to properly provide support or opposition. Fed. R. Civ. P. 56(e).

## III.    DISCUSSION

This dispute is governed by the trust provision of PACA, 7 U.S.C. § 499e(c)(2). Plaintiffs are producers of perishable agricultural commodities and contend that pursuant to PACA, they are entitled to disgorge the proceeds of the subject life insurance policy from NSB.  Plaintiffs argue that the insurance policy, having been purchased with Fredericktown's produce earnings, is a PACA trust asset that should have been held for the benefit of unpaid produce suppliers. NSB counters that Plaintiffs are not entitled to disgorge these proceeds, first, because the 2007 assignment of the life insurance policy to NSB removed the policy and any proceeds from the trust and, second, because NSB is a "bona fide purchaser," having received the proceeds for "value." For the following reasons, the Court finds that the policy and proceeds are PACA trust assets and, further, that NSB does not qualify as a bona fide purchaser "for value." Therefore, NSB is not entitled to retain the amounts received.

1.    **PACA**

The United States Court of Appeals for the Third Circuit in <u>Weis-Buy Services, Inc. v.</u>

<u>Paglia</u>, 411 F.3d 415, 419-20 (3d Cir. 2005),  explained the purpose of PACA is "to deter unfair

business practices and promote financial responsibility in the perishable agricultural goods

market."

> The Act was 'designed primarily for the protection of the producers of perishable
> agricultural products—most of whom must entrust their products to a buyer or
> commission merchant who may be thousands of miles away, and depend for their
> payment upon his business acumen and fair dealing.'

> In 1984 Congress amended PACA to allow for a non-segregated floating trust for
> the protection of producers and growers. Congress recognized that these
> producers and growers tend to be small businesses in a high cost/high risk
> industry. They generally have capital tied up in land and machinery and their
> survival depends on timely returns on the sale of their products.  Congress
> explained:

> > Many commission merchants, dealers, or brokers, in the normal
> > course of their business transactions, operate on bank loans secured
> > by the inventories, proceeds or assigned receivables from sales of
> > perishable agricultural commodities, giving the lender a secured
> > position in the case of insolvency. Under present law, sellers of
> > fresh fruits and vegetables are unsecured creditors and receive little
> > protection in any suit for recovery of damages where a buyer has
> > failed to make payment as required by the contract.

<u>Id.</u>  To remedy the economically fragile and unsecured status of produce sellers, the trust

provision of PACA provides as follows:

> Perishable agricultural commodities received by a commission merchant, dealer,
> or broker in all transactions, and all inventories of food or other products derived
> from perishable agricultural commodities, and any receivables or proceeds from
> the sale of such commodities or products, shall be held by such commission
> merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers
> of such commodities or agents involved in the transaction, until full payment of
> the sums owing in connection with such transactions has been received by such
> unpaid suppliers, sellers, or agents.

7 U.S.C. § 499e(c)(2). The United States Court of Appeals for the Third Circuit, in Bear Mountain Orchards, Inc. v. Mich-Kim, Inc., 623 F.3d 163, 166-67 (3d Cir. 2010), further explained that "[t]he 1984 amendment "'provide[d] a remedy by impressing a trust in favor of the unpaid seller ... on the inventories of commodities and products derived therefrom and on the proceeds of sale of such commodities and products in the hands of the commission merchant, dealer[,] or broker.'" [Weis–Buy, 411 F.3d at 420] (quoting H.R.Rep. No. 98–543, 1984 U.S.C.C.A.N. 405, 407). The produce purchasers are 'require[d] ... to hold sufficient PACA trust assets in trust to pay all suppliers.' Consumers Produce Co. v. Volante Wholesale Produce, Inc., 16 F.3d 1374, 1379 (3d Cir. 1994)." Bear Mountain Orchards, 623 F.3d at 167. Unpaid suppliers are granted priority over secured lenders with regard to PACA trust assets held in trust by produce purchasers. Id., citing Volante, 16 F.3d at 1379. To enforce the rights of unpaid suppliers, federal district courts are "vested with jurisdiction specifically to entertain actions by trust beneficiaries to enforce payment from the trust." 7 U.S.C. § 499e(c)(5).

**2.      Collateral for the NSB/Giles Mortgage Loan**

The parties agree that NSB was granted a security interest in Fredericktown's assets as collateral for the Giles Mortgage, to include "all cash, furniture, fixtures, equipment, accounts receivable, inventory and contract rights, and the proceeds (cash and non-cash) of all of the foregoing used in the operation of its business, … including the proceeds or returned or unearned premiums of insurance, and the proceeds of all the foregoing property." (ECF No. 38, ¶ 11). It appears undisputed that with the exception of the life insurance policy at issue, PACA creditors are presumed to have priority to these assets, which are subject to existing PACA trust liabilities. However, with regard to the 1997 life insurance policy and the proceeds at issue, the parties contest the effect of Fredericktown's assignment of the life insurance policy to NSB as additional

collateral for the Giles Mortgage. The "Assignment of Life Insurance Policy as Collateral," (ECF

No. 38-2), provides, inter alia, as follows:

**A.** For Value Received the undersigned hereby assign transfer and set over to Northwest Savings Bank of Warren, PA, its successors and assigns, (hereinafter called the "Assignee") Policy No. TRAC 000748 issued by Valley Forge Life Insurance Company … upon the life of Gene M. Giles and all claims, options, privileges, rights, title and interest therein and thereunder (except as provided in Paragraph C hereof) [related to the right to collect any disability payments that do not reduce the amount of insurance, the right to designate and change the beneficiary, and the right to elect an optional mode of settlement] subject to all the terms and conditions of the Policy and to all superior liens, if any, which the Insurer may have against the Policy…..

**B.** It is expressly agreed that, without detracting from the generality of the foregoing, the following specific rights are included in this assignment and pass by virtue hereof:

1. The sole right to collect from the Insurer the net proceeds of the Policy when it becomes a claim by death or maturity;

2. The sole right to surrender the Policy and received the surrender value thereof at any time provided by the terms of the Policy and at such other times as the Insurer may allow;

3. The sole right to obtain one or more loans or advances on the Policy, either from the Insurer or, at any time, from other persons, and to pledge or assign the Policy as security for such loans or advances;

4. The sole right to collect and receive all distributions or shares of surplus, dividend deposits or additions to the Policy now or hereafter made or apportioned thereto, and to exercise any and all options contained in the Policy with respect thereto; provided, that unless and until the Assignee shall notify the Insurer in writing to the contrary, the distributions or shares of surplus, divided deposits and additions shall continue on the plan in force at the time of this assignment; and

5. The sole right to exercise all nonforfeiture rights permitted by the term of the Policy or allowed by the Insurer and to receive all benefits derived therefrom.

\* \* \*

**E.** This assignment is made and the Policy is to be held as collateral security for any and all liabilities of the undersigned, or any of them, to the Assignee, either now existing or that may hereafter arise in the ordinary course of business between any

of the undersigned and the Assignee (all of which liabilities secured or to become secured are herein called "Liabilities").

F.   The Assignee covenants and agrees with the undersigned as follow[s]:

1.   That any balance of sums received hereunder from the Insurer remaining after payment of the then existing Liabilities, matured or un-matured, shall be paid by the Assignee to the person entitled thereto under the terms of the Policy had this assignment not been executed;

2.   That the Assignee will not exercise either the right to surrender the Policy or (except for the purpose of paying premiums) the right to obtain policy loans from the Insurer, until there has been default in any of the Liabilities or a failure to pay any premium when due, nor until twenty days after the Assignee shall have mailed, by first-class mail, to the undersigned at the address last supplied in writing to the Assignee specifically referring to this assignment, notice of intention to exercise such right and

3.   That the Assignee will upon request forward without unreasonable delay to the Insurer the Policy for endorsement of any designation of change of beneficiary or any election of an optional mode of settlement.

(ECF No. 38-2).

## 3.    Assignment of the Life Insurance Policy

The threshold issue to be resolved is whether the proceeds of the life insurance policy, purchased in 1997, and paid for with Fredericktown earnings from the agricultural goods market, are an asset of the PACA trust, subject to Fredericktown's PACA liabilities.

In construing PACA, this Court is mindful of the broad interpretation of the statute afforded by the United States Court of Appeals for the Third Circuit, in furtherance of Congress's specific intent to protect produce suppliers ahead of other secured and unsecured creditors.

In Pac. Int'l Mktg., Inc. v. A & B Produce, Inc., 462 F.3d 279 (3d Cir. 2006), the United States Court of Appeals for the Third Circuit rejected the application of common law trust principles which would have permitted a non-PACA beneficiary to recover amounts associated

with providing transportation of produce for sale. In reaching its decision, the Court indicated that any attempt to circumvent the clear intent of Congress would be scrutinized. "Indeed, '[t]he applicability of any principle of trust law to a PACA trust must be tested against the language and purpose of the statute and the accompanying regulations.' PACA expressly protects unpaid sellers, suppliers, and agents as trust beneficiaries, see 7 U.S.C. § 499e(c)(2), and 'entitles the trust beneficiary to a sum certain.' 'PACA's purpose, as Congress has crystallized, is to ensure payment to the unpaid seller in the perishable agricultural commodities industry.' Accordingly, '[i]f PACA's trust is to have any meaning, and Congress's intent is to be effectuated in any way, trust assets must be preserved and not dissipated,' and 'PACA trust beneficiaries are entitled to full payment before trustees may lawfully use trust funds to pay other creditors.'" Id., at 285 (citations omitted). The Court of Appeals thus indicated that it will closely examine attempts to seize trust assets ahead of unpaid PACA trust beneficiaries.

NSB argues that these principles are not implicated by its retention of the life insurance policy proceeds because upon assignment, the policy no longer belonged to Fredericktown as a trust asset. (ECF No. 41, p. 5). In support of their allocation of trust assets, NSB cites Estate of Lellock v. Prudential Ins. Co. of America, 811 F.2d 186 (3d Cir. 1987), a non-PACA post-bankruptcy action resolving entitlement to the proceeds of a life insurance policy assigned through a mortgage loan transaction. In Lellock, the assignment at issue "was absolute and transferred 'all rights, benefits, and advantages to be had or derived therefrom including, without limiting the generality of the foregoing, the right at any time to exercise the loan provisions thereof or to surrender the same for its case value even though the assignment may be for collateral security only.'" Id. at 187. The primary issue before the Court was whether the lien created by the assignment of the policy survived bankruptcy proceedings. The Court held that

the Bankruptcy Code and its legislative history establish that even though the underlying mortgage debt was extinguished in bankruptcy, a preexisting security lien against the policy survives and remains valid. Id. at 188. In addition, and with relevance to this action, the Court held that because the assignment of the policy was "absolute," title passed to the lienholder, "obviating the need for the policy to pass through the Lellock's bankruptcy at all. Consequently, we find that as of the date of the filing … the Lellocks had no interest – contingent or otherwise – in the life insurance policy. Because the policy was never reassigned to them, they never reacquired an interest in it." Id. at 190.

In a footnote, however, the Court observed that "[i]f the debtors had listed the life insurance policy as collateral for the loan or as an asset of their estate in bankruptcy, the policy would not have been considered exempt property. Further, the Lellocks did not pursue the appropriate remedy in bankruptcy. They failed to seek a disallowance of the SBA's claim to the policy during their bankruptcy proceeding. To rule that the Estate is now entitled to the proceeds of the insurance policy would allow the Lellocks to achieve by omission what they failed to pursue in bankruptcy-the conversion of the non-exempt policy to themselves." Id. at 189 n.3. The Court did not reconcile its stated treatment of the policy as removed from the bankruptcy estate on assignment with its conclusion that the policy would not have been exempt had it been properly listed.

NSB argues that Lellock supports its position that ownership of the policy transferred at the time of assignment and, accordingly, the policy is not a trust asset. Plaintiffs respond that unlike bankruptcy, "[a]ny asset purchased with a produce dollar is presumed a PACA trust asset," for the duration of the trust, and in accordance with PACA case law applying common law trust principles, the transfer was not "for value." (ECF No. 46, pp. 2, 3).

This Court finds that the policy at issue, having been purchased and maintained through quarterly premium payments from the proceeds of agricultural products, is a PACA trust asset, and remained a trust asset after the purported assignment. This conclusion finds support in <u>Bear Mountain Orchards</u>, 623 F.3d at 168, where the Court was asked to determine whether the spouse of a PACA trustee could be held individually liable when PACA assets, including the proceeds from the sale of real estate purchased with PACA proceeds, were insufficient to meet all outstanding PACA trust claims. In resolving the issue, the Court implicitly recognized that real estate assets purchased with PACA proceeds are subject to trust claims, even after sale.[2] <u>Id.</u> This is consistent with cases broadly construing the intent of PACA to ensure the availability of assets for unpaid produce suppliers. <u>See</u>, <u>e.g.</u>, <u>In re Kornblum & Co., Inc.</u> 81 F.3d 280 (2d Cir. 1996)(proceeds from the sale of cooperative membership interests and leases on real property, paid for with PACA proceeds, were subject to outstanding PACA claims); <u>A&J Produce Corp. v. Bronx Overall Economic Development Corporation</u>, 542 F.3d 54 (2d Cir. 2008) (*same*).

Construing the policy as a trust asset recognizes that until full payment is made to all sellers, a "nonsegregated 'floating' trust" is created which flows to all inventory and any derivatives or "proceeds thereof." <u>Weis-Buy</u>, 411 F.3d at 419. This prevents circumvention of the intent of the PACA statute by simply converting cash proceeds into other property to be sold

---

[2]  The Court of Appeals specifically included the proceeds of the sale of the produce dealer's warehouse in the assets designated to meet trust claims.  "In October 2007, the Court ordered pro rata distribution of the available trust assets to the valid PACA trust creditors. It found that Fleisher Produce (jointly and severally with other responsible parties) owed appellants approximately $800,000. At the same time, Fleisher Produce had only $27,500 in trust assets remaining. It then sold its warehouse, which netted around $80,000. There was thus no dispute that Fleisher Produce's corporate assets were insufficient to meet all outstanding PACA trust claims." <u>Bear Mountain Orchards</u>, 623 F.3d at 168.

by the trustee or, as in this case, assigning an asset, paid for with agricultural proceeds, to a secured lender and leaving produce sellers unprotected.

In Kornblum, the United States Court of Appeals for the Second Circuit set forth a test to determine whether proceeds from the sale of real estate assets were subject to the PACA trust. Under the test, assets are presumed to be subject to the PACA trust unless it is shown that: (1) no PACA trust existed when the asset in question was purchased; (2) the asset was not purchased with PACA trust assets; or (3) subsequent to purchasing the asset, the buyer paid in full all suppliers, thereby terminating the trust. See In re Kornblum, 81 F.3d at 287.  See also Sam Wang Produce, Inc. v. EE Mart FC, LLC, No. 1:09-CV-12, 2010 WL 605082, at *3 (E.D. Va. Feb. 16, 2010), adopting test and noting adoption in J.A. Besteman Co. v. Carter's, Inc., 439 F. Supp.2d 774, 778 (W.D. Mich. 2006); Atl. Coast Produce, Inc. v. McDonald Farms, Inc., 2004 WL 1381165 (W.D. Va. 2004).

This Court also adopts the Kornblum test and, in applying it to the facts of the present case, it is apparent that the life insurance policy at issue and all subsequent quarterly premiums before and after the assignment were paid for with proceeds from the sale of produce. Further, after the purchase and payment of premiums, certain suppliers, including Plaintiffs, remained unpaid. Accordingly, under Kornblum, the life insurance policy and proceeds are trust assets, which Fredericktown was required to hold for the benefit of PACA creditors.  See, Volante, 16 F.3d at 1379 ("The [PACA] trust provision requires produce purchasers to hold sufficient PACA trust assets in trust to pay all suppliers.  Read in light of the legislative finding, the trust provision also straightforwardly provides unpaid suppliers with priority over secured lenders with regard to

PACA trust assets *held in trust* by produce purchasers.  It effectively vitiates a lender's security interest in trust assets *held by produce purchasers* vis a vis unpaid produce suppliers."). [3]

### 4. Bona Fide Purchaser Defense

It follows that once an asset is purchased from the proceeds of the sale of agricultural commodities, the asset must "be maintained to pay the sellers … *before* payment of any other loan, whether secured or not." Nickey Gregory Co., LLC v. Agricap, LLC, 597 F.3d 591, 599 (4th Cir. 2010).  Failure to do so constitutes breach of the trust, and subjects third parties to an action to disgorge any proceeds received.

This is not to say, however, that a trust asset can never be sold or assigned.  Rather. "third-party transferees, like [NSB] may retain PACA trust assets without liability to trust beneficiaries if they are *bona fide purchasers for value* and *without notice of the breach of trust*."

---

[3] NSB cites to In re United Fruit & Produce Co., Inc., 242 B.R. 295 (W.D. Pa. 1999) as support for the proposition that PACA reaches only cash proceeds or pending inventories and receivables, and not to assets such proceeds are used to purchase, such as the insurance policy at issue.  ECF No. 41, pp. 9-10. The Bankruptcy Court in United Fruit, while acknowledging that "PACA 'is remedial legislation which a court should construe broadly to effectuate its purpose,'" interpreted the language of the statute to exclude vehicles and equipment owned by the trustee but secured by lenders who provided purchase money financing.  Id., at 301-02.  Citing Consumers Produce Co., Inc. v. Volante Wholesale Produce, Inc., 16 F.3d 1374 (3d Cir. 1994), the Bankruptcy Court concluded that because "PACA assets are available for uses other than to pay PACA Suppliers," trust assets may therefore be used to pay other creditors.  United Fruit, 242 B.R. at 302.  However, the Volante Court assumed without deciding that real estate purchased with PACA proceeds was a PACA trust asset and, further, that the trust was breached when loan payments were made to the lienholder.  Volante, 16 F.3d at 1379.  The Volante Court then applied common law trust principles to determine whether any defenses were available. The Court determined that the bank would not be required to disgorge trust assets received, because it received the payments in "money" and so qualified as a "bona fide purchaser for value and without notice of the breach of trust."  Id. at 1380.  Given the Court's holding regarding the reach of PACA as including realty purchased with produce proceeds, NSB's reliance on United Fruit for the proposition that PACA assets are limited to inventories and receivables therefore is not well supported.

Volante, 16 F.3d at 1380 (italics added).  NSB contends that if the policy is deemed a trust asset, the proceeds may be retained because NSB qualifies as a bona fide purchaser for value.

In Volante, the United States Court of Appeals for the Third Circuit held that the bona fide purchaser defense was available to a lender who had received term and credit-line loan repayments ahead of PACA creditors.  The term loan was provided by the lender to Jeffrey Robinson to purchase the Volante business, and the line of credit was issued to Volante for short-term working capital needs after Robinson took over the business.  The unpaid PACA creditors sought to disgorge all loan repayments received.

The bona fide purchaser defense is defined by the Restatement (Second) of Trusts as follows:

> (1) If the trustee in breach of trust transfers trust property to, or creates a legal interest in the subject matter of the trust in, a person who takes for value and without notice of the breach of trust, and who is not knowingly taking part in an illegal transaction, the latter holds the interest so transferred or created free of the trust, and is under no liability to the beneficiary. (2) In the Restatement of this Subject such a transferee is called a "bona fide purchaser."

Id. citing Restatement (Second) of Trusts § 284 (1959).  To determine whether loan payments are for "value," the Court of Appeals observed, "[t]he transfer of trust assets in satisfaction of a pre-existing debt is normally not for value; however, an exception exists where the trust property transferred is a negotiable instrument or money. Restatement (Second) of Trusts § 304 (1959). This exception arises from the necessity 'for practical business transactions that the payee of money in due course of business shall not be put upon inquiry at his peril as to the title of the payor.' 4 Austin W. Scott & William F. Fratcher, The Law of Trusts § 304." Volante, 16 F.3d at 1380.  The Court held that because the lender received PACA trust assets in the ordinary course of business as monetary loan repayments, the transfer was "for value."  This is in keeping with Section 298 of the Restatement (Second) of Trusts, which provides that a transfer is for value

16

"[i]f money is paid or other property is transferred or services are rendered as consideration for the transfer of trust property."

NSB contends that at the time of the assignment, there was no "antecedent debt," such that the Court must find that the assignment was "for value." NSB further argues the transfer was "part of the same [loan] transaction," through which "NSB unquestionably provided value for the Assignment it received." (ECF No. 45, p. 3).

NSB's argument is similar to that advanced by lienholders in A & J Produce Corp. v. Bronx Overall Econ. Dev. Corp., 542 F.3d 54, 58 (2d Cir. 2008), and Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc., 67 F.3d 1063, 1068 (2d Cir. 1995). In both cases, the lienholders contended that pursuant to the financing agreements at issue, value was provided for interests in specified PACA trust assets; thus, the lienholders were not merely creditors holding a security interest subordinate to outstanding PACA creditors.

In Endico, the United States Court of Appeals for the Second Circuit rejected the lienholder's position. The Court examined the underlying transaction to determine if there had been a reduction in the debt owed at the time of the transaction, or a transfer of risk with regard to the underlying debt, so as to permit the transaction to be classified as a "purchase" for value.

> Resolution of whether the "contemporaneous transfer," as CIT describes Merberg's assignment of accounts receivable to CIT and CIT's loan advances to Merberg, constitutes a purchase for value or whether the exchange provides CIT with no more than a security interest, depends on the substance of the relationship between CIT and Merberg, and not simply the label attached to the transaction. In determining the substance of the transaction, the Court may look to a number of factors, including the right of the creditor to recover from the debtor any deficiency if the assets assigned are not sufficient to satisfy the debt, the effect on the creditor's right to the assets assigned if the debtor were to pay the debt from independent funds, whether the debtor has a right to any funds recovered from the sale of assets above that necessary to satisfy the debt, and whether the assignment itself reduces the debt. The root of all of these factors is the transfer of risk. Where the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts

is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor. If the lender holds only a security interest, however, the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to satisfy the loan.

Id. at 1068-69 (citations omitted).  The Court went on to examine the financing agreement and determined that the assignment did not contemporaneously reduce the trustee's indebtedness of the lienholder and so the assignment was not a purchase for value.

The first sentence of the financing agreement belies the contention that CIT purchased the accounts receivable. As the agreement states, CIT is "pleased to confirm the terms and conditions under which we shall make loans and advances to you upon the security of your accounts receivable." Just as important, the terms of the agreement make clear that what CIT held was no more than a security interest. Merberg's assignment of accounts receivable had no effect on the outstanding balance of Merberg's indebtedness. Instead, Merberg's loan balance was reduced only upon receipt of payment, whether such payments arose from the accounts receivable or from any other source. Moreover, CIT could demand payment directly from Merberg at any time for the entire outstanding loan balance notwithstanding that CIT held what it termed an assignment of Merberg's accounts receivable. Finally, in the event that Merberg paid all outstanding obligations to CIT, CIT would no longer hold an interest in Merberg's outstanding accounts receivable. Each of these provisions indicates that the primary risk of a customer's non-payment remained at all times with Merberg and that the assignment alone did not reduce Merberg's obligations to CIT.

Id.  Accordingly, in the absence of a transfer of risk or a contemporaneous reduction in the debt owed, the Court required the lienholder to disgorge amounts collected on the assigned accounts to the extent necessary to satisfy the claims of the PACA trust beneficiaries.

Similarly, in A & J Produce Corp, a PACA dealer purchased unit shares in a cooperative with a loan provided by the defendant, secured by the units.  Subsequently, PACA creditors filed claims against the produce dealer for failure to pay.  The dealer defaulted on its purchase loan and the defendant lienholder instituted foreclosure proceedings.  The PACA creditors moved to enjoin the foreclosure action, contending that the units were a trust asset.  The defendant

lienholder argued that its lien was provided in exchange for purchase financing and as such the property was removed from the PACA trust. The Court of Appeals reiterated the need to examine the transaction to analyze the transfer of risk involved. The Court determined that because the dealer continued to bear the risk of loss, the lien was not a transfer for value, and any proceeds from the sale of the property were properly awarded to PACA creditors. 542 F.3d at 59.

The evidence before the Court in this action establishes that NSB loaned funds to Mr. and Mrs. Giles, and that Mr. and Mrs. Giles held title in the purchased property as tenants in the entirety. To the extent Fredericktown received "value" for its assignment of the policy proceeds, it was, as noted by NSB, the ability to lease the premises from the Giles family, to share with another Giles entity, County Fresh Market, LLC. (ECF No. 41, p.7 n4). NSB posits that this contemporaneous exchange renders the policy assignment for value, sufficient to trump all PACA creditors. However, it is clear that at the time of assignment, there was no contemporaneous reduction in the amount of the mortgage to effectuate a "purchase," nor did the assignment eliminate NSB's right to recover from other Fredericktown assets any deficiency still owed if the proceeds of the policy were insufficient to satisfy the debt. Pursuant to its terms, the assignment is identified as "collateral," and Fredericktown retained ownership of at least $50,000 of the policy proceeds, or more, depending upon the amount outstanding in the event of default. Under these circumstances, the assignment did not divest all of Fredericktown's interest in the proceeds of the policy, nor did it effectuate a change in risk as to the underlying debt. Accordingly, the assignment was not "for value."

PACA does not prohibit the granting of a security interest in trust assets to collateralize a loan, nor does PACA impose strict liability on secured lenders by making them trustees or

guarantors of the PACA trust. <u>Volante</u>, 16 F.3d at 1381   PACA, however, does prohibit a secured lender such as NSB from using its position to place its own interests ahead of those of unpaid produce sellers.  <u>See</u>, <u>Nickey Gregory Company, LLC v. ArgiCap, LLC</u>, 597 F.3d 591, 603-04 (4th Cir 2010).  Because the assignment of Fredericktown's life insurance policy as collateral for the Giles Mortgage granted NSB only a security interest in a Fredericktown trust asset, the policy and its proceeds are subject to the rights of the PACA trust beneficiaries.  NSB must, therefore, disgorge the $200,000 it has collected and remit payment to Plaintiffs.

IV.    **CONCLUSION**

For the foregoing reasons, the Motion for Summary Judgment filed on behalf of Plaintiffs Consumer Produce Company, Inc. of Pittsburgh, Premier Produce Co., Inc. and Coface North America, Inc. as assignee of J.E. Corcoran Company (collectively, "Plaintiffs" or "CP"), (ECF No. 40), is granted and the Motion for Summary Judgment filed on behalf of NSB, (ECF No. 39), is denied.  An appropriate Order follows.

**ORDER**

Upon consideration of the , the Motion for Summary Judgment filed on behalf of Plaintiffs Consumer Produce Company, Inc. of Pittsburgh, Premier Produce Co., Inc. and Coface North America, Inc. as assignee of J.E. Corcoran Company (collectively, "Plaintiffs" or "CP"), (ECF No. 40), and the Motion for Summary Judgment filed on behalf of NSB, (ECF No. 39), and the briefs and exhibits filed in support and opposition thereto, and for the reasons set forth in the accompanying Opinion, IT IS HEREBY ORDERED that the Motion for Summary Judgment filed on behalf of Plaintiffs Consumer Produce Company, Inc. of Pittsburgh, Premier Produce

Co., Inc. and Coface North America, Inc. as assignee of J.E. Corcoran Company (collectively,

"Plaintiffs" or "CP"), (ECF No. 40), is granted and the Motion for Summary Judgment filed on

behalf of NSB, (ECF No. 39), is denied.

IT IS FURTHER ORDERED that, pursuant to Rule 4(a)(1) of the Federal Rules of

Appellate Procedure, if the Plaintiffs wish to appeal from this Order they must do so within thirty

(30) days by filing a notice of appeal as provided in Rule 3, Fed. R. App. P.

BY THE COURT:

/s/ Maureen P. Kelly
MAUREEN P. KELLY
CHIEF UNITED STATES MAGISTRATE JUDGE

Dated: February 19, 2015

cc:     All Counsel of Record via CM-ECF